IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION
2:21-cv-00034-FL

**Lillie Brown Clark**,
as the Administrator for the Estate of Andrew Brown, Jr.,

Plaintiff,

v.

**Investigator Daniel Meads**, in his individual capacity;
**Deputy Sheriff II Robert Morgan**, in his individual capacity;
**Cpl. Aaron Lewellyn**, in his individual capacity ;
**Sheriff Tommy S. Wooten**, II, in his official capacity;
**Western Surety Bonding Company**,
Surety for Sheriff Tommy S. Wooten, II

_____/

## AMENDED COMPLAINT FOR DAMAGES

COMES NOW Plaintiff Lillie Brown Clark, as the Administrator for the Estate

of Andrew Brown, Jr. (hereinafter "Plaintiff"), by and through the undersigned

attorneys, and hereby files this Amended Complaint pursuant to FRCP 15 (a) (1)(B)[1]

against Investigator Daniel Meads, in his individual capacity (hereinafter "Defendant

Meads"); Deputy Sheriff II Robert Morgan, in his individual capacity (hereinafter

---

[1] Plaintiff's original complaint filed on July 14, 2021, was rejected due to a Notice of Deficiency.
(Doc 1). On July 14, 2021, Plaintiff counsel was directed to refile the complaint complying fully
with Local Civil Rule 83.1. On July 22, 2021, Plaintiff refile her complaint correcting all deficiency.
Plaintiff labeled her refiled complaint "Amended Complaint." Plaintiff's amended complaint serves
as Plaintiff's original complaint.

"Defendant Morgan"); Cpl. Aaron Lewellyn, in his individual capacity (hereinafter "Defendant Lewellyn"); Sheriff Tommy S. Wooten, II, in his official capacity as Sheriff of Pasquotank County, North Carolina (hereinafter "Defendant Wooten"); Western Surety Bonding Company, Surety for Defendant Wooten. Plaintiff incorporates Exhibit in Original Complaint in her amended complaint.

## INTRODUCTION

***The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are a little slower afoot does not always justify killing the suspect. A police officer may not seize an unarmed, nondangerous suspect by shooting him dead.***

***------Justice Byron White, Tennessee vs Garner, 471 U.S. 1 (1985)***

On April 21, 2021, Andrew Brown, Jr, a 42-year-old black man, was gunned down by three deputies of the Pasquotank County Sheriff's Office. ("PCSO") At the time Andrew Brown, Jr. was shot, he was unarmed and posing no threat to law enforcement or others.

Plaintiff brings federal constitutional claims against Investigator Daniel Meads, in his individual capacity; Deputy Sheriff II Robert Morgan, in his individual capacity; Cpl. Aaron Lewellyn, in his individual capacity, for committing acts under color of law that deprived Andrew Brown, Jr. (hereinafter "Brown") of his rights under the

2

Constitution and the laws of the State of North Carolina by using unlawful and deadly force against Brown; whereby, Brown was unarmed and posing no threat to law enforcement or others. Further, Plaintiffs brings state law claims of Wrongful Death, Battery and Assault against Investigator Daniel Meads, in his individual capacity; Deputy Sheriff II Robert Morgan, in his individual capacity; Cpl. Aaron Lewellyn, in his individual capacity, and Sheriff Tommy S. Wooten, II, in his official capacity as the elected Sheriff of Pasquotank County.

## JURISDICTION AND VENUE

1.

This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 over Plaintiff's claims under the U.S. Constitution, which are brought both directly under 42 U.S.C. § 1983.

2.

This Court has supplemental jurisdiction over Plaintiff's state law claim pursuant to 28 U.S.C. § 1367 because it is so related to the federal claims that it forms part of the same case or controversy under Article III of the U.S. Constitution.

3.

This Court has personal jurisdiction over all Defendants as it relates to Plaintiff's state law claims. Defendant Tommy S. Wooten, II maintained an official bond issued as required by N.C. Gen. Stat. § 162-8 and the laws of North Carolina.

3

The official bond issued by surety to Defendant Tommy S. Wooten, II and the deputies of his office as Sheriff of Pasquotank County, covers damages resulting from the neglect, misconduct, or misbehavior of the Sheriff or his deputies in the performance of their official duties. Further, Defendant Tommy S. Wooten, II waives his sovereign immunity defense by the purchase of liability insurance under N.C. Gen. Stat. § 153A-435. Further, at all times relevant to this complaint

4.

Venue is proper in this District under 28 U.S.C. § 1391(b)(2). All of the events giving rise to this Complaint occurred within this District.

<u>PARTIES</u>

5.

At all times relevant hereto, Plaintiff Lillie Brown Clark as the Administrator for the Estate of Andrew Brown, Jr, is the paternal aunt of the decedent Andrew Brown, Jr., and a citizen of the United States of America.

6.

At all times relevant hereto, Defendant Daniel Meads was a citizen of the United States and a resident of the State of North Carolina and was acting under color of state law in his capacity as a law enforcement officer employed by the PCSO. Defendant Daniel Meads is sued in his individual capacity.

7.

At all times relevant hereto, Defendant Robert Morgan was a citizen of the

4

United States and a resident of the State of North Carolina and was acting under color of state law in his capacity as a law enforcement officer employed by the PCSO. Defendant Robert Morgan is sued in his individual capacity.

8.

At all times relevant hereto, Defendant Aaron Lewellyn was a citizen of the United States and a resident of the State of North Carolina and was acting under color of state law in his capacity as a law enforcement officer employed by the PCSO. Defendant Aaron Lewellyn is sued in his individual capacity.

9.

At all times material hereto, Defendant Tommy S. Wooten, II, was Sheriff of Pasquotank County, an entity, corporate and political, duly organized under the laws of the State of North Carolina. Defendant Tommy S. Wooten, II, was responsible for his deputies' training, supervision, and conduct. Defendant Tommy S. Wooten, II, is responsible for ensuring that his deputies obey the laws of the State of North Carolina and ensuring that his rules, regulations, and policies are followed and enforced. Defendant Tommy S. Wooten, II is sued in his official capacities.

10.

At all times material hereto, Western Surety Bonding Company issued a bond to Defendant Tommy S. Wooten, II and the deputies of his office as Sheriff of Pasquotank County in the amount of fifteen thousand dollars, that covers damages

5

resulting from the neglect, misconduct, or misbehavior of the Sheriff or his deputies in the performance of their official duties.

## FACTUAL ALLEGATIONS

*Events That Occurred on April 21, 2021*

11.

On April 21, 2021, at approximately 5:00 a.m., a briefing was held at the PCSO regarding the execution of a search warrant on Andrew Brown Jr's (hereinafter "Brown"), property and arrest warrant for Brown.

12.

According to Tyler Doughtie, of the Dare County Sheriff's Office (hereinafter "DCSO"), it was briefed that there were no indications that Brown was armed and dangerous. Defendant Meads and Lt Steven Judd, of the DCSO, led the briefing.

13.

On April 21, 2021, at approximately 8:20 a.m., Brown, the father of seven children, was sitting in the driver's seat of his vehicle parked in his driveway located at 421 Perry St. Elizabeth City, North Carolina.

14.

At approximately 8:23 a.m., members of the PCSO, DCSO, Kitty Hawk Police Department and Kill Devil Hills Police Department, arrived at 421 Perry Street to

execute the search warrant and to execute the arrest warrants for Brown out of Dare County, North Carolina.

15.

Notably, the Dare County arrest warrants were unlawful because the arrest warrants only bore the typed name of the purported judicial officer who issued the warrants and no actual signature of the judicial officer in violation of N.C. Gen. Stat. § 15A-301(a)(2). (See Exhibit A).

16.

The arrest warrants were based on the allegation that Brown had sold drugs on two separate occasions in Dare County in mid-March and late March of 2021. Based on the allegations within the unlawful arrest warrants, the PCSO secured a search warrant for the premises located at 421 Perry St. and Brown's vehicle.

17.

The allegation of selling illegal drugs nor the possession of illegal drugs are considered violent felonies in North Carolina. Additionally, Neither PCSO nor DCSO possessed any information that Brown possessed any weapons. Further neither PCSO nor DCSO possessed any information that Brown had a violent history against law enforcement or a propensity of violence towards others.

18.

Before members of the PCSO, DCSO, Kitty Hawk Police Department and Kill Devil Hills Police Department arrived, Brown was sitting in his vehicle parked in his driveway. Upon the law enforcement officer's arrival to his residence, Brown had his cellphone to his ear. At all times relevant, Brown's hands were visible to the law enforcement officers on scene.

19.

Notwithstanding the fact that Brown had not been accused of committing any violent felonies and no intelligence existed that Brown was known to possess any weapons or that Brown had a propensity for violence towards law enforcement or others, Brown was confronted by several members of the PCSO Special Operation and Tactics Team (SOAT) armed with assault rifles coupled with loud shouting and profanity directed towards him.

20.

Due to the unwarranted confrontation, Brown was startled and afraid. Subsequently, in an attempt to escape, Brown placed his vehicle in reverse and backed away from the law enforcement officers. At no time were any members of the PCSO, DCSO, Kitty Hawk Police Department, Kill Devil Hills Police Department or other, were in any imminent threat of harm or injury from Brown or his vehicle.

21.

Next, Brown placed his vehicle in drive and negotiated his vehicle leftward away from law enforcement officers. At no time were any members of the PCSO, DCSO, Kitty Hawk Police Department, Kill Devil Hills Police Department or others, were in any imminent threat of harm or injury from Brown or his vehicle as he drove his vehicle away from law enforcement officers.

22.

During the course of Brown's attempt to flee, Defendant Meads, allegedly fired his service weapon into the front windshield of Brown's vehicle. At the time that shot was allegedly fired, no members of the PCSO, DCSO, Kitty Hawk Police Department, Kill Devil Hills Police Department or others were in any imminent threat of harm or injury by Brown or his vehicle.

23.

As Brown's vehicle drove away from law enforcement officers through a vacant lot adjacent to Brown's house, at that time, Defendant Meads fired approximately seven (7) times into Brown's moving vehicle. At no time were any members of the PCSO, DCSO, Kitty Hawk Police Department, Kill Devil Hills Police Department or others, were in any imminent threat of harm or injury by Brown or his vehicle that warranted Defendant Meads to fire approximately seven (7) times into Brown's moving vehicle.

24.

Defendant Meads fired approximately seven (7) 9mm. rounds from his Glock -17 into Brown's moving vehicle. At no time were any members of the PCSO, DCSO, Kitty Hawk Police Department, Kill Devil Hills Police Department or others, were in any imminent threat of harm or injury by Brown or his vehicle that warranted Defendant Meads to fire approximately seven (7) times into Brown's moving vehicle.

25.

Additionally, as Brown's vehicle drove across the vacant lot adjacent to Brown's house and after Brown's vehicle had amassed considerable distance away from the law enforcement officers, Defendant Morgan fired five (5) .233 rounds from his AR-15 Bushmaster Rifle into Brown's moving vehicle. At no time were any members of the PCSO, DCSO, Kitty Hawk Police Department, Kill Devil Hills Police Department or others, were in any imminent threat of harm or injury by Brown or his vehicle that warranted Defendant Morgan to fire five (5) times into Brown's moving vehicle. Notably, Defendant Morgan was the only officer on scene that fire an assault rifle.

26.

Defendant Lewellyn fired approximately four (4) 9mm. rounds from his Glock-17 into Brown's moving vehicle only after Brown's vehicle had gained a

considerable distance away from the law enforcement officers across the vacant lot adjacent to his house. At no time were any members of the PCSO, DCSO, Kitty Hawk Police Department, Kill Devil Hills Police Department or others, were in any imminent threat of harm or injury by Brown or his vehicle that warranted Defendant Lewellyn to fire four (4) times into Brown's moving vehicle.

27.

Notably, on April 23, 2021, Sgt. Michael Swindell ("hereinafter Sgt. Swindell") of the PCSO, stated in his interview with the North Carolina State Bureau of Investigation ("SBI"), that Brown backed his vehicle up in order to turn and drive through the vacant lot adjacent to Brown's house. Sgt. Swindell believed that Brown was attempting to flee. Further, Sgt. Swindell stated that he did not fire his weapon because he felt as though Brown was not going to hit him and there was no indication that Brown was armed.

28.

Also, notably, on April 22, 2021, Sgt. Kenneth Mitchell Bishop (hereinafter "Sgt. Bishop"), of the PCSO, interviewed with the SBI. In his interview, Sgt. Bishop told the SBI that Brown backed his vehicle up approximately 10-20 feet after he was approach by law enforcement. Subsequently, Sgt. Bishop relocated to the front passenger corner of Brown's vehicle. Next, Brown put his vehicle into drive and cut the wheels to the left away from Sgt. Bishop. Brown then drove his vehicle across the

open lot away from residence and towards Roanoke Ave. At that time, Sgt. Bishop heard multiple gunshots but could not tell who was shooting. Sgt. Bishop did not discharge his weapon. Sgt. Bishop did not see any indication that Brown had a weapon.

29.

Sgt. Bishop and Sgt. Swindell were the ranking PCSO deputies on scene at the time of the shooting and both did not fire their weapons at Brown.

30.

As a result of Defendants Meads, Morgan and Lewellyn's intentional, malicious and reckless disregard of the life and safety of Brown, Brown's body and vehicle were riddled with bullets and Brown was killed.

31.

Brown sustained multiple gun shots wounds to his right arm and a fatal gunshot wound to the back of his head as he drove away from law enforcement. (See Exhibit B). At the time Brown was shot in his right arm and the back of his head, Brown did not pose any threat or harm to any members of the PCSO, DCSO, Kitty Hawk Police Department, Kill Devil Hills Police Department or others.

32.

After Brown's moving vehicle was fired upon by Defendants Meads, Morgan and Lewellyn, Brown's unguided moving vehicle crashed into a tree after his vehicle

crossed over Roanoke Ave. Subsequently, Brown was removed from his vehicle by law enforcement officers and placed face down on the ground.

33.

Subsequently, Brown's house was search after the shooting. During the search of Brown's house, Defendant Meads asked Kitty Hawk Police Detective Justin Corbell Langley ("Langley") to shine his flashlight on Defendant Meads while in a dark room inside Brown's house so Defendant Meads could count the remaining rounds in the magazine of his Glock-17. On May 13, 2021, Langley disclosed to the SBI that Defendant Meads was stressing out about how many times he fired his weapon at Brown's vehicle.

34.

On May 3, 2021, Defendant Meads admitted to the SBI that he altered the gun he used to shoot at Brown's vehicle while he was in a dark room inside Brown's house and before his weapon was confiscated as evidence. Defendant Meads' admission came only after it was depicted on another officer's body camera footage that he had removed his magazine inside Brown's house. Notably, Defendant Meads failed to mention in first interview with the SBI that he manipulated his magazine while inside Brown's house in order to see how many shots he fired prior to surrendering his weapon as evidence. In fact, while in route to the PCSO after the incident, Defendant

Meads further manipulated his weapon by removed all his bullets from his magazine. According to Defendant Meads, he only wanted to count his bullets.

35.

On Sunday, April 25, 2021, Defendant Wooten requested from the NC Sheriff Association that an outside Sheriff's Office to conduct an internal investigation of the shooting.

36.

Johnston County Sheriff, Steve Bizzell, Wayne County Sheriff, Larry Pierce, and Pitt County Sheriff, Paula Dance, agreed to assign internal affairs investigators from their respective departments to conduct the internal investigation for Pasquotank County Sheriff's Office.

37.

The internal investigation concluded that Brown's vehicle drove away from the officers, through a vacant lot beside the residence, at that time, a series of multiple gunshots were discharged at and into the vehicle by deputies standing behind and to the right of the vehicle.

38.

The SBI conducted an investigation surrounding the shooting death of Brown.

39.

All the ballistic evidence was submitted to the NC Crime Lab for analysis, the results concluded that all the fired casings recovered at the scene were fired from the weapons assigned to Defendants Meads, Lewellyn and Morgan. The projectile recovered from Brown's head was fired from Defendants Morgan's AR-15 Bushmaster rifle. The projectile recovered from his shoulder was not fired from Defendant Morgan's rifle and it could not be identified or eliminated as having fired from either of Defendant Lewellyn's or Mead's Glock-17 firearms.

40.

After the SBI's investigation, the SBI provided its findings to the First Judicial Circuit District Attorney Andrew Womble (hereinafter "Womble").

41.

On May 18, 2021, Womble declared that the shooting death of Brown was justified and that no law enforcement officer involved in the shooting death of Brown would be charged.

42.

At the time Womble declared that the shooting death of Brown was justified, Womble knew or should have known, that the lead investigator for the entire operation, Defendant Meads, concealed to the SBI that he altered his weapon while inside of Brown's house and while Brown was laying on the ground dying outside,

and that Defendant Meads removed bullets from his weapon prior to surrendering it as evidence. Womble knew or should have known, that Defendant Meads was stressed about how many times he fired his weapon at Brown's vehicle.

43.

At the time Womble declared that the shooting death of Brown was justified, Womble knew or should have known that an internal investigation concluded that Brown's vehicle drove away from the officers, through a vacant lot beside the residence, at that time, a series of multiple gunshots were discharged at and into the vehicle by Deputies standing behind and to the right of the vehicle.

44.

At the time Womble declared that the shooting death of Brown was justified, Womble knew or should have known, that Sgt. Swindell believed that Brown was attempting to flee and that Sgt. Swindell that did not fire his weapon because he felt as though Brown was not going to hit him and there was no indication that Brown was armed.

45.

At the time Womble declared that the shooting death of Brown was justified, Womble knew or should have known, that Sgt. Bishop did not discharge his weapon because did not see any indication of Brown with a weapon.

46.

At the time Womble declared that the shooting death of Brown was justified, Womble knew or should have known, that Defendants Meads, Lewellyn and Morgan stated reasons why they fired their weapons at Brown, were because they perceived a threat to Sgt. Swindell and Lunsford by Brown's vehicle. Womble knew or should have known that Defendants Meads, Lewellyn and Morgan's statements was inconsistent with the internal investigation that concluded that Brown vehicle drove away from the officers through a vacant lot beside the residence, and at that time, a series of multiple gunshots were discharged at and into the vehicle by Deputies standing behind and to the right of the vehicle.

47.

However, for arguendo purposes only, if such threat initially existed, that threat clearly ceased once Brown drove pass Sgt. Swindell and Lunsford and distanced his vehicle away from Sgt. Swindell and Lunsford. However, Defendants Meads, Lewellyn and Morgan intentionally and deliberately discharged their weapons into Brown's vehicle despite the fact, Brown's vehicle had gained a considerable distance away from all of law enforcement officers.

48.

In <u>Williams v. Strickland</u>, 917 F.3d 763 (4th Cir. 2019), the Fourth Circuit of United States Court of Appeals held that:

**Officers had violated the Fourth Amendment to the extent that they**

**started to use deadly force, or continued to use deadly force, once the car had driven by them—i.e., once it was no longer reasonable for them to believe that the car was about to run them (or their fellow officers) over. This was true even though mere seconds separated the point at which deadly force was lawful from the point at which deadly force was unlawful. As we put it then, "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated."**

49.

The state of North Carolina is within the Fourth Circuit of United States Court of Appeals.

50.

Notably, the PCSO Use of Force Policy 300.4.1 <u>MOVING VEHICLES</u> states the following:

Shots fired at or from a moving vehicle involve additional considerations and risks, and are rarely effective. When feasible, deputies should take reasonable steps to move out of the path of an approaching vehicle instead of discharging their firearm at the vehicle or any of its occupants. A deputy should only discharge a firearm at a moving vehicle or its occupants when the deputy reasonably believes there are no other reasonable means available to avert the imminent threat of the vehicle, or **if deadly force other than the vehicle is directed at the deputy or others. Deputies should not shoot at any part of a vehicle in an attempt to disable the vehicle**. (See Exhibit C)

51.

At all times relevant, Defendants Meads, Lewellyn and Morgan, were acting under color of state law in their capacities as a law enforcement officer employed by

PCSO.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Excessive Force in Violation of the Fourth Amendment
(Against Defendants Meads, Lewellyn and Morgan)

52.

Plaintiff realleges and incorporates herein by reference each and every

allegation contained in paragraphs 1 through 51 of this Complaint.

42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation,
custom or usage of any state or territory or the District of Columbia
subjects or causes to be subjected any citizen of the United States or
other person within the jurisdiction thereof to the deprivation of any
rights, privileges or immunities secured by the constitution and law
shall be liable to the party injured in an action at law, suit in equity, or
other appropriate proceeding for redress…..

53.

All individual Defendants to this claim, is a person for purposes of 42 U.S.C.

§ 1983.

54.

All individual Defendants, at all times relevant hereto, were acting under

the color of state law in their capacities as a Deputy or Officer for PCSO and their

19

acts or omissions were conducted within the scope of his official duties or employment.

## 55.

At the time of the complained of events, Brown had a clearly established constitutional right under the Fourth Amendment to be secure in his person from unreasonable seizure through excessive force.

## 56.

Brown also had the clearly established Constitutional right under the Fourth Amendment to bodily integrity and to be free from excessive force by law enforcement.

## 57.

Any reasonable PCSO Deputy/Officer knew or should have known of these rights at the time of the complained of conduct as they were clearlyestablished at that time.

## 58.

All individual Defendants' actions and use of force, as described herein, were objectively unreasonable in light of the facts and circumstances confronting them and violated the Fourth Amendment rights of Brown.

## 59.

All individual Defendants' actions and use of force, as described herein, were

also malicious and/or involved reckless, callous, and deliberate indifference to Brown's federally protected rights. The force used by all individual Defendants shocks the conscience and violated the Fourth Amendment rights of Brown.

60.

All individual Defendants unlawfully seized Brown by means of objectively unreasonable, excessive and conscious shocking physical force. The force used was deadly force and did cause the death of Brown.

61.

All individual Defendants engaged in the conduct described by this Complaint willfully, maliciously, in bad faith, and in reckless disregard of Brown's protected constitutional rights.

62.

All individual Defendants did so with shocking and willful indifference to Brown's rights and with conscious awareness that it could cause Brown severe bodily harm or death.

63.

The acts or omissions of all individual Defendants were the moving forces behind Brown's death. The acts or omissions of all individual Defendants as described herein intentionally deprived Brown of his constitutional rights and caused him other damages. All individual Defendants are not entitled to qualified immunity for his actions.

64.

As a proximate result of all individual Defendants' unlawful conduct, Brown was killed. As a further result of the individual Defendants' unlawful conduct, Brown has incurred special damages, including medical expenses and other special damages related expenses, in amounts to be established at trial.

65.

On information and belief, Brown suffered lost future earnings and impaired earnings capacities from the not yet fully ascertained sequelae of his injuries, in amounts to be ascertained in trial. Plaintiffs are further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law. There may also be special damages for lien interests.

66.

In addition to compensatory, economic, consequential and special damages, Plaintiffs are entitled to punitive damages against each of the individually named Defendants under 42 U.S.C. § 1983, in that the actions of each of these individual Defendants have been taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Brown. All Defendants are jointly and severally liable for violating Brown's Fourth Amendment Rights.

67.

WHEREFORE, Plaintiff prays for the following relief:

1. Judgment for compensatory damages in excess of $15,000,000.00.

2. Judgment for exemplary or punitive damages;

3. Cost of suit;

4. Reasonable attorney fees, pursuant to 42 U.S.C. § 1988;

5. Trial by jury as to all issues so triable; and

Such other relief as this Honorable Court may deem just and appropriate.


## SECOND CLAIM FOR RELIEF

### (Assault and Battery)
(All individual Defendants)


68.

Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 51 of this Complaint

69.

All individual Defendants pointed a firearm at Brown and unjustifiably used deadly force against Brown, such force was objectively excessive and unreasonable under the circumstances.

70.

All individual Defendants' intentional acts as described more fully hereinabove, put Brown in actual, subjective apprehension of immediate harmful or offensive contact.

71.

Brown's apprehension was objectively reasonable under the circumstances in that a person of ordinary care and prudence under the same or similar circumstances would have believed that harmful, or offensive contact was about to occur.

72.

All individual Defendants' actions against Brown were unreasonable and unlawful. At the time Brown was shot by the individual Defendants, Brown did not pose any threat or harm to any law enforcement officers or others. All individual Defendants acted with a depraved indifference to human life and conscious disregard for the safety of the general public, constituted an intentional unwelcome and unprivileged touching of Brown, and was undertaken in bad faith and with actual malice.

73.

As a further direct and proximate result of the conduct described above, Brown died. Prior to his death Brown suffered loss of his liberty and freedom, bodily injury resulting in pain and suffering, mental anguish, and medical expenses for treatment and care. Brown did not consent to contact with, from or by any of the

individual Defendants.

74.

All individual Defendants are jointly and severally liable for their assault and battery towards Brown.

75.

WHEREFORE, Plaintiffs prays for the following relief:

1. Judgment for compensatory damages in excess of $5,000,000.00.

2. Judgment for exemplary or punitive damages;

3. Cost of suit;

4. Reasonable attorney fees:

5. Trial by jury as to all issues so triable; and

Such other relief as this Honorable Court may deem just and appropriate.

**THRID CLAIM FOR RELIEF**
**(Assault and Battery)**
(Against Tommy S. Wooten, II, in his Official Capacity as Sheriff of Pasquotank)

76.

Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 51 of this Complaint.

77.

All individual Defendants' actions against Brown were unreasonable and unlawful. At the time Brown was shot by the individual Defendants, Brown did not

25

pose any threat or harm to any law enforcement officers or others. All individual Defendants acted with a depraved indifference to human life and conscious disregard for the safety of the general public, constituted an intentional unwelcome and unprivileged touching of Brown, and was undertaken in bad faith and with actual malice.

78.

As a further direct and proximate result of the conduct described above, Brown died. Prior to his death Brown suffered loss of his liberty and freedom, bodily injury resulting in pain and suffering, mental anguish, and medical expenses for treatment and care.

79.

At the time of the complained incident, all individual Defendants were acting within the scope of their employment with Tommy S. Wooten, II, in his Official Capacity as Sheriff of the Pasquotank County, North Carolina. At the time all individual Defendants committed the acts described herein, they were acting within the course and scope of their employment and/or agency with PCSO. As such, Tommy S. Wooten, II, in his Official Capacity as Sheriff of the Pasquotank County, North Carolina is liable for the intentional acts of all individual Defendants. Therefore, the intentional acts of all individual Defendants are imputed to Tommy S. Wooten, II, in his Official Capacity as Sheriff of the Pasquotank County, North Carolina through the doctrines of agency, vicarious liability and respondeat superior.

80.

As a further direct and proximate result of the conduct described above, Brown died. Prior to his death Brown suffered loss of his liberty and freedom, bodily injury resulting in pain and suffering, mental anguish, and medical expenses for treatment and care.

81.

WHEREFORE, Plaintiffs prays for the following relief:

6. Judgment for compensatory damages in excess of $5,000,000.00.

7. Judgment for exemplary or punitive damages;

8. Cost of suit;

9. Trial by jury as to all issues so triable; and

Such other relief as this Honorable Court may deem just and appropriate.

## FOURTH CLAIM FOR RELIEF
### (Wrongful Death/Intentional)
(All Defendants)

82.

Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 51 of this Complaint.

83.

On April 21, 2021, all individual Defendants, employees and uniformed officers with PCSO, committed a battery when they discharged their weapons to intentionally strike Brown that resulted in the untimely and unlawful death of Brown.

84.

The aforementioned act of discharging their weapons at Brown, was intentional and deliberate. All the individual Defendants' acts were carried out in bad faith and with malicious intent to harm Brown. As a direct and proximate result of their acts, Brown was murdered.

85.

At the time of the complained of incident, all individual Defendants were acting within the scope of their employment with Tommy S. Wooten, II, in his Official Capacity as Sheriff of the Pasquotank County, North Carolina. At the time all individual Defendants committed the acts described herein, they were acting within the course and scope of their employment and/or agency with PCSO. As such, Tommy S. Wooten, II, in his Official Capacity as Sheriff of the Pasquotank County, North Carolina is liable for the intentional acts of all individual Defendants. Therefore, the intentional acts of all individual Defendants are imputed to Tommy S. Wooten, II, in his Official Capacity as Sheriff of the Pasquotank County, North Carolina through the doctrines of agency, vicarious liability and respondeat superior.

86.

WHEREFORE, Plaintiffs prays for the following relief:

1. Judgment for compensatory damages in excess of $5,000,000.00.

2. Judgment for exemplary or punitive damages;

3. Cost of suit;

4. The value of support and services the deceased person had provided to the surviving family member;

5. Loss of companionship, guidance, and protection provided by the deceased person;

6. Mental and emotional pain and suffering due to the loss of a child, and medical or funeral expenses any surviving family member has paid for the deceased person;

7. The deceased person's estate may also recover certain types of damages. These include:

   a. lost wages, benefits, and other earnings, including the value of lost earnings that the deceased person could reasonably have been expected to make if he or she had lived

   b. lost "prospective net accumulations" of the estate, or the value of earnings the estate could reasonably have been expected to collect if the deceased person had lived, and

   c. medical and funeral expenses that were paid by the estate directly.

d.  Such other relief as this Honorable Court may deem just and appropriate.

## FIFTH CLAIM FOR RELIEF
### (Wrongful Death Negligence/ Gross Negligence)
(All Defendants)
(Plead in the Alternative Pursuant to Federal Rule of Civil Procedure 8(d)(2).)

87.

Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 51 of this Complaint.

88.

All Individual Defendants owed a duty to Brown and to the general public, to perform their duties in such a way as to avoid placing Brown and other members of the public in unreasonable danger of serious injury or death. Furthermore, all Defendants owed a duty to ensure that Brown and other members of the public would be free from unreasonable searches and seizures and excessive force.

89.

All individual Defendants breached their duty by shooting at Brown even though he posed no threat to law enforcement or others.

90.

Specifically, members of PCSO who fired their weapons at Brown as he drove his vehicle away from them, clearly violated PCSO Use of Force Policy 300.4.1.

91.

All individual Defendants' negligent acts and omissions constitute proximate causes of the incident which resulted in injuries to and the death of Brown which Plaintiff on behalf of the Estate of Andrew Brown, Jr. is entitled to recover damages under the North Carolina Wrongful Death Statute, N.C. Gen. Stat. §28A-18-2, as more particularly described herein.

92.

At the time of the complained incident, all individual Defendants were acting within the scope of their employment with Tommy S. Wooten, II, in his Official Capacity as Sheriff of the Pasquotank County, North Carolina. At the time all individual Defendants committed the acts described herein, they were acting within the course and scope of their employment and/or agency with PCSO. As such, Tommy S. Wooten, II, in his Official Capacity as Sheriff of the Pasquotank County, North Carolina is liable for the intentional acts of all individual Defendants. Therefore, the negligent acts and omissions of all individual Defendants are imputed to Tommy S. Wooten, II, in his Official Capacity as Sheriff of the Pasquotank County, North Carolina through the doctrines of agency, vicarious liability and respondeat superior.

93.

WHEREFORE, Plaintiff prays for the following relief:

1. Judgment for compensatory damages in excess of $5,000,000.00;

2. Judgment for exemplary or punitive damages;

3. Cost of suit;

4. The value of support and services the deceased person had provided to the surviving family member;

5. Loss of companionship, guidance, and protection provided by the deceased person;

6. Mental and emotional pain and suffering due to the loss of a child, and medical or funeral expenses any surviving family member has paid for the deceased person;

7. The deceased person's estate may also recover certain types of damages. These include:

   a. lost wages, benefits, and other earnings, including the value of lost earnings that the deceased person could reasonably have been expected to make if he or she had lived

   b. lost "prospective net accumulations" of the estate, or the value of earnings the estate could reasonably have been expected to collect if the deceased person had lived, and

   c. medical and funeral expenses that were paid by the estate directly.

Such other relief as this Honorable Court may deem just and appropriate.

## PRAYER FOR RELIEF

Plaintiff prays that this Court enter judgment for the Plaintiff and against each of the Defendants and grant:

A.  compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount in excess of $30,000,000.00

    B. economic losses on all claims allowed by law;

    C. special damages in an amount to be determined at trial;

D.  punitive damages on all claims allowed by law against all Defendants and in an amount in excess of $1,000,000.00

E.  attorneys' fees and the costs associated with this action under 42 U.S.C. § 1988, including expert witness fees, on all claims allowed by law;

    F. pre- and post-judgment interest at the lawful rate; and,

G.  any further relief that this court deems just and proper, and any other appropriate relief a law and equity.

**PLAINTIFF REQUESTS A TRIAL BY JURY.**

Respectfully submitted this the 28th of October 2021

/s/Harry M. Daniels
Harry M. Daniels
The Law Offices of Harry M. Daniels, LLC
233 Peachtree St. NE Ste. 1200
Atlanta, GA 30303
Tel. 678.664.8529
Fax. 800.867.5248
daniels@harrymdaniels.com
Georgia Bar No.: 234158

Special Appearance of counsel for Plaintiff in the above captioned matter, in accordance with Local Civil Rule 83.1(d)

/s/Chantel Cherry-Lassiter
Chantel Cherry-Lassiter
CCL LAW OFFICE, PLLC.
1851 W. Ehringhaus St. #136
Elizabeth City, NC 27909
Tel. 252.999.8380
Fax. 252.999.8381
chantelcherrylassiter@ccllaw.org
NC Bar No.: 54345

Local Counsel Rule 83.1(d) Counsel for Plaintiff

/s/Chance D. Lynch
Chance D. Lynch
LYNCH LAW, PLLC.
1015A Roanoke Ave. Suite A
Roanoke Rapids, NC 27870
Tel. 252.507.0110
Fax. 252.565.0102
chancelynch@lynchlaw.org
NC Bar No.: 39872

Local Counsel Rule 83.1(d) Counsel for Plaintiff

/s/Bakari Sellers
STROM LAW FIRM
6923 N. Trenholm Road
Columbia, SC 29206

Tel. 803.252.4800
bsellers@stromlaw.com
South Carolina Bar No.:79714

Special Appearance of counsel for Plaintiff in the above captioned matter, in accordance with Local Civil Rule 83.1(d)

CERTIFICATE OF SERVICE

I hereby certify that on October  28, 2021, I electronically filed the foregoing

AMENDED COMPLAINT FOR DAMAGES with the Clerk of the Court using the

CM/ECF system, which will send notification of such filing to the following CM/ECF

participants:

Christopher J. Geis
Womble Bond Dickinson (US) LLP
One West Fourth Street
Winston Salem, NC 27101
336-721-3543
Fax: 336-726-2221
Email: Chris.Geis@wbd-us.com

Ripley Eagles Rand
Womble Bond Dickinson (US) LLP
555 Fayetteville Street, Suite 1100
Raleigh, NC 27602
919-755-8125
Fax: 919-755-6752
Email: Ripley.Rand@wbd-us.com

Sonny S. Haynes
Womble Bond Dickinson (US) LLP

One West Fourth Street
Winston-Salem, NC 27101
Telephone: (336) 721-3600
Email Sonny.Haynes@wbd-us.com

Dan McCord Hartzog , Jr.
Hartzog Law Group LLP
2626 Glenwood Avenue, Suite 305
Raleigh, NC 27608
919-480-2450
Fax: 919-480-2450
Email: dhartzogjr@hartzoglawgroup.com

Katherine Barber-Jones
Hartzog Law Group LLP
2626 Glenwood Avenue, Suite 305
Raleigh, NC 27608
919-424-0091
Fax: 919-424-0091
Email: kbarber-jones@hartzoglawgroup.com

Frederick Hughes Bailey, III
Sumrell Sugg
416 Pollock Street
New Bern, NC 28560
252-633-3131
Fax: 252-633-3507
Email: fbailey@nclawyers.com

Ryan David Eubanks
Sumrell Sugg
416 Pollock Street
New Bern, NC 28560
252-633-3131
Fax: 252-633-3507
Email: reubanks@nclawyers.com

Scott C. Hart
Sumrell Sugg
416 Pollock Street
New Bern, NC 28560

36

252-633-3131
Fax: 252-633-3507
Email: shart@nclawyers.com

Norwood P. Blanchard , III
Crossley McIntosh Collier Hanley & Edes, PLLC
5002 Randall Parkway
Wilmington, NC 28403
910-762-9711
Fax: 910-256-0310
Email: norwood@cmclawfirm.com

/s/Harry M. Daniels
Harry M. Daniels
The Law Offices of Harry M. Daniels, LLC
233 Peachtree St. NE, Ste. 1200
Atlanta, GA 30303
Tel. 678.664.8529
Fax. 800.867.5248
daniels@harrymdaniels.com
Georgia Bar No.: 234158